**Randal M. BEVEVINO, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 08–677 C.**

United States Court of Federal Claims.

June 9, 2011.

Judith D. Galat, with whom was David A. Borer, Washington, DC, for plaintiffs.

James P. Connor, United States Department of Justice, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Reginald T. Blades, Jr., Assistant Director, Washington, DC, for defendant. Melanie J. Watson, Office of Personnel Management, Washington, DC, of counsel.

## OPINION

BUSH, Judge.

Before the court are the parties' cross-motions for summary judgment, filed pursu-

ant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). The motions have been fully briefed, and oral argument was neither requested by the parties nor deemed necessary by the court. For the reasons set forth below, plaintiffs' motion is denied and defendant's cross-motion is granted.

## BACKGROUND[1]

Plaintiffs in this action "are former and current employees of the Federal Bureau of Prisons, Federal Correctional Institution [ (FCI) ] at McKean, Pennsylvania." Compl. ¶ 1. These federal employees claim that they have been paid the wrong wage under the Prevailing Rate Systems Act of 1972, Pub.L. No. 92–392, 86 Stat. 564, codified as amended at 5 U.S.C. §§ 5341–5349 (2006) (PRSA), and the implementing regulations of the PRSA. *Id.* Plaintiffs seek compensation to redress the alleged underpayment of their salaries for the six-year period preceding the filing of their complaint. Pls.' Mot. at 21.

Defendant challenged this court's jurisdiction over plaintiffs' pay claims, a challenge that was denied in *Bevevino v. United States,* 87 Fed.Cl. 397 (2009). The court's 2009 opinion provided a review of the PRSA, and a truncated version of that review is reproduced here. The focus of the dispute in this case is on the discretion of the government, under the PRSA and its implementing regulations, to define the geographic boundaries of "wage areas," a determination which directly affects the pay of certain federal workers whose workplaces are located within those wage areas.

### I. The Prevailing Rate Systems Act

The policy section of the PRSA clearly reflects the goal of adjusting federal wages for so-called blue collar federal occupations, in trade, craft and laboring positions, for geographically specific prevailing wage rates. 5 U.S.C. § 5341. This means, in general, that all such federal workers performing substantially equal work in a local wage area should receive substantially equal pay, and their federal wages should be in line with non-federal wages for comparable work in that local wage area:

> It is the policy of Congress that rates of pay of prevailing rate employees be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and be based on principles that—
>
> (1) there will be equal pay for substantially equal work for all prevailing rate employees who are working under similar conditions of employment in all agencies within the same local wage area;
>
> . . . .
>
> (3) the level of rates of pay will be maintained in line with prevailing levels for comparable work within a local wage area. . . .

*Id.*

Furthermore, the statutory provisions of the PRSA show that the geographic definition of the pertinent local wage area directly affects the salaries of prevailing rate employees of the federal government. The United States Office of Personnel Management (OPM) has the specific responsibility of "defin[ing], as appropriate . . . the boundaries of . . . individual local wage areas for prevailing rate employees. . . ." 5 U.S.C. § 5343(a)(1). OPM also has a general responsibility "by regulation, [to] prescribe practices and procedures for . . . administering the prevailing rate system." *Id.* § 5343(c).

### II. PRSA Implementing Regulations

The regulation that is most directly implicated in plaintiffs' back pay claim is 5 C.F.R. § 532.211 (2011). Therein, a "local wage area" typically consists of "survey areas" and "nonsurvey areas":

> (a) Each wage area shall consist of one or more survey areas along with nonsurvey areas, if any.
>
> (1) *Survey area:* A survey area is composed of the counties, parishes, cities, or townships in which survey data [relevant to pay rates] are collected. Except in very

---

1. The facts recited herein are taken from the parties' filings and are undisputed unless otherwise noted. The court makes no findings of fact in this opinion. The court notes that citations and references to the complaint are to the amended complaint filed April 28, 2010.

unusual circumstances, a wage area that includes a Metropolitan Statistical Area shall have the Metropolitan Statistical Area as the survey area or part of the survey area.

(2) *Nonsurvey area:* Nonsurvey counties, parishes, cities, or townships may be combined with the survey area(s) to form the wage area through consideration of the criteria in paragraph (d)(1) of this section.

5 C.F.R. § 532.211(a)(1)–(2). When combining nonsurvey areas with survey areas to delineate the geographical boundaries of a local wage area, OPM considers the following factors:

Adjacent economic communities or political units ... may be combined through consideration of:

(i) Distance, transportation facilities, and geographic features;

(ii) Commuting patterns; and

(iii) Similarities in overall population, employment, and the kinds and sizes of private industrial establishments.

5 C.F.R. § 532.211(d)(1). Another section of this regulation states that "[g]enerally, the criteria listed in paragraph (d)(1) of this section are considered in the order listed." *Id.* § 532.211(d)(2).

### III. Plaintiffs' Workplace in McKean County, Pennsylvania

Here, plaintiffs allege that OPM assigned their county to the wrong local wage area. The county where the plaintiffs in this suit currently work, or worked, is McKean County, Pennsylvania, a nonsurvey area. Compl. ¶¶ 5, 14. Plaintiffs allege that McKean County was previously combined with the wrong survey area, and thus, that McKean County has been included in the wrong local wage area for the years at issue in this suit. *Id.* ¶¶ 24, 26. McKean County was, until recently, defined as being within the Pittsburgh local wage area. *Id.* ¶ 22. The Buffalo local wage area has higher prevailing rates than the Pittsburgh wage area. *Id.* ¶ 21. Plaintiffs argue that McKean County should have been included in the Buffalo local wage area, and their back pay claims arise from the "inclusion of McKean County, Pennsylvania, in the Pittsburgh, Pennsylvania, wage area rather than the Buffalo, New York, wage area." *Id.* ¶ 24. In January of 2009, McKean County was changed from the Pittsburgh wage area to the Buffalo wage area. Pls.' Mot. at 14.

### DISCUSSION

### I. Standard of Review for RCFC 56 Cross–Motions

"[S]ummary judgment is a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed. Cir.1987) (internal quotations and citations omitted). The moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c)(1). A genuine issue of material fact is one that could change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A summary judgment "motion may, and should, be granted so long as whatever is before the ... court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting former version of Fed.R.Civ.P. 56(c)). However, the nonmoving party has the burden of producing sufficient evidence that there is a genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in its favor. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Such evidence need not be admissible at trial; nevertheless, mere denials, conclusory statements or evidence that is merely

colorable or not significantly probative is not sufficient to preclude summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 835–36 (Fed.Cir.1984). "The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant." *Barmag,* 731 F.2d at 836. Any evidence presented by the non-movant is to be believed and all justifiable inferences are to be drawn in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

Cross-motions for summary judgment "are not an admission that no material facts remain at issue." *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997) (citing *United States v. Fred A. Arnold, Inc.,* 573 F.2d 605, 606 (9th Cir.1978)). The parties may focus on different legal principles and allege as undisputed a different set of facts. *Id.* "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." *Id.*

## II. Standard of Review for PRSA Pay Claims

■■■ Because the PRSA confers considerable discretion upon OPM to set appropriate wages for prevailing rate employees, precedent in this circuit has afforded considerable judicial deference to pay rates set by OPM under this authority. The most common formulation of this deferential standard of review is that OPM's pay decision may not be set aside unless there has been an abuse of discretion, or, in other words, unless OPM's decision was so arbitrary as to be clearly wrong. *See, e.g., Adams v. United States,* 810 F.2d 1142, 1144 (Fed.Cir.1987) ("The administrative determination can only be set aside for abuse of discretion, or because it is so arbitrary as to be clearly wrong.") (citations and internal quotations omitted); *Nat'l Maritime Union v. United States,* 682 F.2d 944, 955 (Ct.Cl.1982) (*National Maritime*) ("We cannot say in this case that the Government's [pay decision] was so arbitrary and capricious as to constitute an abuse of discretion."); *Baratt v. United States,* 585 F.2d 1041, 1045 (Ct.Cl. 1978) (noting that to determine whether or not the employing agency had "abused its administrative discretion," the court must " 'determine whether plaintiffs have met their heavy burden of proving that the Secretary's action in this instance was so arbitrary as to be clearly wrong.' " (quoting *Benevento v. United States,* 461 F.2d 1316, 1320 (Ct.Cl. 1972))); *Daigle v. United States,* 217 Ct.Cl. 376, 386 (1978) ("[W]e are not willing to say that in these circumstances the government's refusal to adopt these three prevailing pay practices was so arbitrary or capricious as to constitute an abuse of discretion."); *Blaha v. United States,* 511 F.2d 1165, 1170 (Ct.Cl. 1975) (reversing a pay decision because "we view[ ] the disallowance as an abuse of discretion in the absence of valid reasons that could be urged in its support"); *Turner v. United States,* 44 Fed.Cl. 588, 593 (1999) ("To have a court set aside the determinations of federal agencies in prevailing rate disputes, a plaintiff must show that there has been an abuse of discretion, or that such a determination is so arbitrary as to be clearly wrong.") (citations omitted). Thus, in PRSA cases, this court must apply a deferential "arbitrary and capricious" standard of review, a standard that has been defined by the United States Supreme Court.[2] *See, e.g.,*

---

**2.** The court notes that the judicial deference standard in these PRSA cases employs the terms "abuse of discretion" and "arbitrary and capricious" interchangeably, and roughly synonymously. For this reason, this court has turned to precedent explicating the arbitrary and capricious standard of review of agency action to guide its review of PRSA claims. *See Turner,* 44 Fed.Cl. at 593 n. 6. Pursuant to this deferential standard, a reasonable decision of a government

agency will not be disturbed simply because the court would have reached a different conclusion if confronted with the same factual circumstances. *Compare Daigle,* 217 Ct.Cl. at 386 ("Unless the abuse of discretion is flagrant, as in *Blaha,* it appears better not to see it in every [pay] decision that we ourselves would not make."), *with Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (" 'If the court finds a reasonable basis for the agency's action,

*Turner,* 44 Fed.Cl. at 593 n. 6 (relying on *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (*Overton Park*), for its definition of the arbitrary and capricious standard of review).

 There are many formulations of the arbitrary and capricious standard of review. *Overton Park,* the case cited in *Turner,* sets forth these principles:

> [T]he court must consider whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Overton Park,* 401 U.S. at 416, 91 S.Ct. 814 (citations omitted). Another leading Supreme Court case describes four examples of arbitrary agency action which may be set aside under this deferential standard of review:

> Normally, an agency [action] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (*State Farm*). The arbitrary and capricious standard described in *Overton Park* and *State Farm* provides a useful tool for applying the standard of review for PRSA pay claims set forth in *Adams, National Maritime, Baratt, Daigle* and *Blaha,* and for this reason, the court will rely on *Overton*

*Park* and *State Farm* for its review of the PRSA claims in this case.[3]

## III. Analysis Overview

The parties have greatly narrowed the focus of what is already a narrow and deferential review. In 1994, OPM considered the wage area classification of McKean County and chose to maintain McKean County in the Pittsburgh local wage area rather than reassign McKean County to the Buffalo local wage area. Pls.' Mot. at 8. It is this 1994 OPM decision that is challenged by plaintiffs. *See* Pls.' Reply at 4 (contesting defendant's position that a long-standing OPM policy "provided a reasoned basis for OPM's retaining McKean County in the Pittsburgh wage area after ... OPM revisited this issue in 1994").

Plaintiffs do not argue that OPM failed to consider relevant factors set forth in 5 C.F.R. § 532.211(d)(1), or that OPM's ruling contained factual errors. Thus, there are three principal (and related) questions before the court: (1) whether OPM's decision was "a clear error of judgment," *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814; (2) whether OPM's decision was "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856; and, (3) whether OPM's decision was "contrary to 5 C.F.R. [§ ] 532.211," Pls.' Reply at 1. Unfortunately for plaintiffs' cause, none of these questions can be answered in the affirmative.

Defendant also suggests that the court should decline to consider plaintiffs' PRSA claims because plaintiffs were represented by a union that failed, until recently, to request that the local wage area for McKean County be changed, and because the union's representative endorsed, in 1994, OPM's proposal to retain McKean County in the Pittsburgh wage area. *See* Def.'s Mot. at 27–28. Defendant argues that plaintiffs' pay claims are

---

the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the ... regulations.'" (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971))).

3. In other contexts, courts have recognized that an arbitrary or capricious agency action is also an abuse of that agency's discretion. *See, e.g., Affum v. United States,* 566 F.3d 1150, 1161 (D.C.Cir.2009) (noting that the abuse of discretion standard applicable in that case would not permit a court to sustain an arbitrary or capricious agency action) (citations omitted).

thus barred for failure to exhaust administrative remedies. *Id.* The court does not reach defendant's alternative argument regarding failure to exhaust administrative remedies, because this issue is not necessary to the resolution of the parties' cross-motions.[4]

## IV. Discretion and Deference

### A. Administrative Discretion Inherent in the PRSA

Because the level of discretion afforded the federal government by the PRSA has been previously determined by the Court of Claims and the United States Court of Appeals for the Federal Circuit, this court must follow the precedential guidance of those decisions. *See, e.g., Crowley v. United States,* 398 F.3d 1329, 1335 (Fed.Cir.2005) (warning that this court should first review binding precedent for the interpretation of a statute, rather than engaging in a *de novo* analysis of the meaning of the statute). The Federal Circuit has explicitly held that the PRSA conveys a broad grant of administrative discretion. *See, e.g., Adams,* 810 F.2d at 1143–44 (" 'Prevailing rates' wage legislation like § 5349, ... —with its express reference to adjustment 'from time to time as nearly as is consistent with the public interest'—bestows 'a broad congressional grant of administrative discretion.' " (quoting 5 U.S.C. § 5349 and *Benevento,* 461 F.2d at 1320)). Plaintiffs' prevailing rate pay is likewise governed by a statutory scheme that vests the government with broad administrative discretion.

■ For prevailing rate employees such as the plaintiffs in this case, "[t]he pay of prevailing rate employees shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates." 5 U.S.C. § 5343(a). "To carry out this subsection[,] ... the Office of Personnel Management shall define, as appropriate[,] ... the boundaries of ... individual local wage areas for prevailing rate employees having regular wage schedules and rates." *Id.* The court does not detect in these provisions a limit on

OPM's discretion greater than the limits on pay-setting discretion discussed in *Adams* or similar cases. *See Baratt,* 585 F.2d at 1045–46 (relying on *Benevento* and other cases to establish a standard of "limited judicial review" of PRSA claims brought under 5 U.S.C. § 5349(a), due to the broad congressional grant of administrative discretion in that statute); *Blaha,* 511 F.2d at 1167 (noting that the "broad Government discretion in fixing pay under Section 5348 [has been] repeatedly upheld" in cases brought under the PRSA). The court necessarily concludes that under the PRSA, OPM has a broad grant of discretion to administer the prevailing rate pay system, and that discretion extends to the adjustment, from time to time, of local wage area boundaries.

### B. Deference to the Agency's Interpretation of Its Own Regulation

The parties differ as to the deference this court should accord OPM's interpretation of its own regulation setting forth the procedures for combining nonsurvey areas and survey areas into local wage areas. Plaintiffs contend that no deference is due if the regulation is clear on its face, relying on *Christensen v. Harris County,* 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Pls.' Mot. at 15. Plaintiffs also argue that deference "may not be appropriate where there are inconsistencies in the agency's interpretation," relying on *Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. 344, 356, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000). Pls.' Mot. at 16. Defendant, on the other hand, asserts that deference to an agency's interpretation of its own regulation is due when " 'the language of a regulation is ambiguous or susceptible to more than one plausible reading.' " Def.'s Mot. at 11 (quoting *Am. Airlines, Inc. v. United States,* 551 F.3d 1294, 1300 (Fed.Cir. 2008)). Defendant notes that the court's task is not to choose the best interpretation of the regulation; rather, it is to sustain the agency's interpretation unless that interpretation is plainly erroneous or inconsistent with the

---

4. The court notes that defendant's answer to the complaint asserts the affirmative defense of waiver, along with the affirmative defense of failure to exhaust administrative remedies. Answer

¶ 29. The court has not considered whether the defenses of failure to exhaust administrative remedies or waiver/estoppel have any applicability to the circumstances of this case.

regulation. *See id.* (citing *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n,* 400 F.3d 1352, 1364 (Fed.Cir.2005); *James v. Office of Pers. Mgmt.,* 372 F.3d 1365, 1369 (Fed.Cir.2004)).

### 1. Was OPM Consistent in Its Interpretation of Section 532.211(d)?

The court first addresses the question of whether OPM's change in position from 1994 to 2008 as to the correct wage area for McKean County reflects an inconsistency in OPM's interpretation of 5 C.F.R. § 532.211(d). The court notes that McKean County is closer to Buffalo than to Pittsburgh. *See* Pls.' App. at 52 (pursuant to two different measures applied by OPM in 1994, McKean County was 154–157 miles from Pittsburgh, and 91 miles from Buffalo). In 1994, distance, the sole criterion favorable to a change in the boundaries of Pittsburgh's wage area, was considered by OPM to be an insufficient reason to change the local wage area designation of several counties. *See id.* at 42–43 (showing OPM's recommendation that the following counties remain in the Pittsburgh wage area, despite being closer to a different wage area: Tuscawaras, OH; Centre, PA; Clinton, PA; Erie, PA; Huntington, PA; McKean, PA; Potter, PA; Warren, PA). In 1994, OPM, when confronted with a "mixed" analysis of factors determinative of local wage area classification, did not consider distance, alone, to be sufficiently compelling to reclassify a county to a new local wage area. *See id.*

In 2008, however, when OPM reviewed four Pennsylvania counties in the Pittsburgh wage area, McKean County's greater distance from Pittsburgh and lesser distance from Buffalo was cited as the rationale for a change of local wage area to the Buffalo wage area.[5] *See* Pls.' App. at 93. The court

notes that three other Pennsylvania counties were affected by McKean County's change to the Buffalo wage area. OPM decided, in 2008, that portions of Elk County and Forest County, and all of Warren County, should also be changed to the Buffalo wage area, because McKean County's change in local wage area would trigger a potential inequity in the pay of federal workers in the Allegheny National Forest located in these four counties. *See id.* at 92–93.

■ Each OPM analysis weighed distance as an important factor in the classification of McKean County's local wage area, yet, in 2008, OPM's classification decision was the opposite of its 1994 decision. This change in position might, in another case, reveal an inconsistency in OPM's interpretation of § 532.211(d). Here, however, the OPM reports, and other evidence in the record, reveal a reasonable explanation for the different decisions made by OPM in 1994 and 2008 and a consistency in OPM's interpretation of the governing regulation.

First, the court notes that the 1994 consideration of the boundaries of the Pittsburgh wage area was "part of a system-wide review of all … wage areas." Pls.' App. at 35. Most of the counties selected for review were selected because these counties were closer to some other metropolitan area than to Pittsburgh. *Id.* at 39–40. In contrast, the reclassification of McKean County in 2008 was the direct result of a request by the union representing prevailing rate employees in McKean County that McKean County be reclassified to the Buffalo wage area. *Id.* at 89.

In layman's language, OPM, in 1994, appeared to be asking whether, as a general matter, counties that were at the outer limits of the Pittsburgh wage area might need to be re-assigned to other, closer wage areas. The general conclusion was that distance alone was not enough to change the boundaries of

---

**5.** Aside from distance, the OPM report mentions an "additional factor," noting that plaintiffs' employer, FCI, had begun operations in northwestern McKean County in 1989, well after McKean County's original assignment to the Pittsburgh wage area. Pls.' App. at 93. The mention of this "additional factor" appears to be an attempt to explain why McKean County was initially placed

in the Pittsburgh wage area, rather than an attempt to explain why OPM, in 2008, decided that McKean County should be changed to the Buffalo wage area. It should be noted that FCI was in operation and was the principal federal facility in McKean County at the time of the 1994 OPM analysis of McKean County's local wage area classification.

the wage areas in question, when the various other regulatory factors were indeterminate. *See* Pls.' App. at 42–43. In OPM's view, distance alone was not a "compelling" reason to make such changes. *See id.* Thus, in 1994, OPM read 5 C.F.R. § 532.211(d) as putting a strong emphasis on distance as a factor in creating and redrawing local wage area boundaries, but distance was not seen, as a general matter, as compelling a county's reclassification, absent additional reasons to make the change. This interpretation of the regulation is also evident in 2008, as shown by the evidence before the court.

For example, the position of the Federal Prevailing Rate Advisory Committee (FPRAC) on the classification of McKean County's local wage area changed between 1994 and 2008. As defendant points out, the FPRAC endorsed OPM's 1994 recommendations as to the boundaries of the Pittsburgh wage area. Pls.' App. at 262–63. In 2008, the FPRAC likewise endorsed OPM's new (and opposite) recommendation that McKean County be changed to the Buffalo wage area. *Id.* at 114. The union representative on the FPRAC whose union represents prevailing rate employees in McKean County concurred in both of these FPRAC decisions. Def.'s Facts ¶¶ 29–31, 54. Thus, one of the additional factors, along with distance, in OPM's 2008 reclassification of the wage area for McKean County is the support of the FPRAC and the union for this change.

There appear to have been other factors considered by OPM in 1994 and 2008. National forests, such as the Allegheny National Forest, are kept in the same wage area, to the extent practicable, to avoid pay inequities within the forest.[6] *See* Pls.' App. 114; Def.'s App. 16, 40, 51–52, 55. The four Pennsylvania counties containing this national forest are about halfway between Buffalo and Pittsburgh. *See* Pls.' App. at 100, 103. To keep these four counties together in one wage area, at least one of the counties must be placed in a wage area that is not the wage area closest to the county. *See id.* at 103 (showing that Forest County is closer to Pittsburgh than to Buffalo, but that Warren County is closer to Buffalo than to Pittsburgh). Thus, the OPM decisions in 1994 and 2008 appear to have weighed and balanced the distance factor; the goal of keeping all four Pennsylvania counties containing the Allegheny National Forest in the same wage area; and the consensus recommendation of the FPRAC (including input from plaintiffs' union), in order to reach a reasonable wage area definition.[7]

Finally, the record before the court shows that OPM generally considers reclassification of counties into different wage areas based on distance, alone, to be inadvisable. *See* Def.'s App. at 17 ("If OPM placed every county in the wage area that the county was closest to by distance when the other regulatory factors were indeterminate, it would cause a significant disruption to the . . . system, requiring OPM to redefine the wage areas of many nonsurvey area counties."). Unless the change is supported by an additional reason, reclassification based on distance is not compelling or required by 5 C.F.R. § 532.211, in OPM's view. *See* Def.'s

---

6. Plaintiffs "object" to defendant's contention that such a policy exists, Pls.' Resp. to Def.'s Facts ¶ 12, but have mustered no convincing arguments or evidence in support of their objection. *See infra* note 10.

7. The court acknowledges that there is no explicit reference to the Allegheny National Forest in the 1994 OPM report, or of the goal of keeping counties containing a national forest together in the same wage area. The court notes, however, that another national forest, the San Bernardino National Forest, is currently maintained in the same local wage area, even though this necessitates splitting certain counties into national forest portions, and non-national forest portions, *see* 5 C.F.R. Pt. 532 Subpt. B App. C (2011), and that this practice dates from at least 1990, *see* Prevail-

ing Rate Systems, 55 Fed.Reg. 46140, 46152 (Nov. 1, 1990). According to an OPM staff member and a union representative, both of whom served for many years on the FPRAC, a national forest is and has been a type of "geographical feature[ ]," 5 C.F.R. § 532.211(d)(1)(i), considered in local wage area determinations. Pls.' App. at 443, 446; Def.'s App. at 52. Although documentation of the precise rationale for McKean County's inclusion in the Pittsburgh wage area prior to 1994 is no longer extant, Pls.' App. at 445, OPM's 1994 redetermination of the Pittsburgh wage area appears to have incorporated, at least implicitly or historically, some level of concern that the Allegheny National Forest remain within the same local wage area, if practicable.

App. at 16 ("In the interest of maintaining continuity ..., OPM has a long-standing policy of redefining wage areas only if there is a compelling reason to do so."). For example, although Warren County is closer to Buffalo than to Pittsburgh, in 2008 OPM analyzed the regulatory factors and found that because "[a]ll other criteria are inconclusive[,] ... we believe there is no clear indication that Warren County should be placed in a different ... wage area." Pls.' App. at 93. It was the goal of keeping the Allegheny National Forest in the same wage area, an additional factor, that justified OPM's 2008 decision to reclassify Warren County to the Buffalo wage area. *See id.*

Upon review of the undisputed facts in the record, the court sees no marked difference in OPM's interpretation of 5 C.F.R. § 532.211(d) in 1994, and its interpretation of the same regulation in 2008. The court therefore sees no reason to withhold deference to OPM's interpretation of the regulation because of allegations that OPM was inconsistent in its interpretation. The court now turns to the regulation itself, primarily to decide whether the regulation is clear on its face or susceptible to more than one plausible interpretation.

## 2. The Controlling Regulation Vests Discretion in OPM, Is Susceptible to Multiple Interpretations, and Is Entitled to Deference

■ The text of the regulation sets forth the following criteria, and states that, generally, the criteria will be considered in the order listed:

(d)(1) Adjacent economic communities or political units ... may be combined through consideration of:

(i) Distance, transportation facilities, and geographic features;

(ii) Commuting patterns; and

(iii) Similarities in overall population, employment, and the kinds and sizes of private industrial establishments.

(2) Generally, the criteria listed in paragraph (d)(1) of this section are considered in the order listed.

5 C.F.R. § 532.211(d)(1)–(2). In 1992, when proposing the updated regulatory criteria for "defining ... wage area boundaries," OPM noted that such criteria had "historically ... been considered and applied in that order." Pls.' App. at 33. OPM also commented that when considering the updated criteria, "no one criterion will be the single determining factor." *Id.*

The court finds that the terms "may" and "[g]enerally" indicate that OPM possesses discretion in evaluating the criteria listed in § 532.211(d)(1). *See, e.g., Green v. Gen. Servs. Admin.*, 220 F.3d 1313, 1318 (Fed.Cir. 2000) (holding that the use of the word "may" in the regulation at issue in that case vests the federal government with discretion). Of course, the regulation here also places limits on that discretion, and directs OPM to apply the criteria in the order listed. Because distance is the first criterion listed, any plausible reading of the regulation requires OPM to place more emphasis on distance than on any other single criterion.

Plaintiffs go too far, however, when they assert that in 1994 the regulation compelled OPM to place McKean County in the Buffalo wage area, because all of the other listed criteria were indeterminate, and McKean County is closer to Buffalo than to Pittsburgh. *See* Pls.' Mot. at 20 ("Since McKean County is considerably closer to Buffalo, adherence to the regulation would have mandated that OPM place McKean County in the Buffalo wage area."). In plaintiffs' view, if distance is in favor of changing a local wage area classification, and all other factors are mixed or indeterminate, OPM has no discretion, under § 532.211(d), to keep a nonsurvey area in its current local wage area.

The regulation is silent, however, as to the circumstances that would *compel* OPM to change a nonsurvey area to a different local wage area. To be sure, the criteria to be considered, and the relative importance of distance, are clearly set forth in the regulation. Nothing in § 532.211(d), however, suggests that the only possible reading of the regulation is that OPM must change the boundaries of a local wage area when distance favors the change and the other crite-

ria are mixed or indeterminate.[8] In promulgating § 532.211(d), OPM did not put itself in a position where distance trumps the agency's discretion in every circumstance. *See* Pls.' App. at 284 (FPRAC minutes explaining OPM's 1994 recommendation to retain several counties, including McKean County, in the Pittsburgh wage area) ("And with the balance of the factors being indeterminate and perhaps only distance being the one where it appeared to be a bit closer, [OPM] didn't feel that the weight of the factors gave us this compelling need to redefine the wage areas.").

Although plaintiffs' reading of the regulation is plausible, it is certainly not the only possible interpretation of the weight to be given to the regulatory criteria, or of the discretion retained by OPM. The court finds that it must defer to OPM's long-standing interpretation of its own regulation. *Gose v. U.S. Postal Serv.*, 451 F.3d 831, 837 (Fed.Cir. 2006) (noting the broad deference afforded an agency's interpretation of its own regulation, especially where that interpretation has been consistent over time). The court now turns to its deferential review of OPM's 1994 decision regarding the boundaries of the Pittsburgh wage area.

## V. OPM's 1994 Decision to Keep McKean County within the Pittsburgh Wage Area Survives Review

 It is undisputed that in 1994, in the redetermination of the proper wage area for McKean County, OPM considered the criteria in § 532.211(d)(1) in the order listed. Pls.' Mot. at 16; Def.'s Mot. at 14–15; Pls.' App. at 41, 52, 56, 59–61. Furthermore, plaintiffs have not suggested that OPM failed

to correctly analyze the data before it to determine which factors favored Buffalo and which factors favored Pittsburgh at that time. Thus, the only flaw in the 1994 decision asserted by plaintiffs is that OPM refused to accord the appropriate weight to the distance factor favoring Buffalo over Pittsburgh.

McKean County is approximately 65 miles closer to Buffalo than to Pittsburgh, using the measures applied by OPM in 1994. Pls.' App. at 52. It is perhaps useful to note, however, that Buffalo, although closer than Pittsburgh, is still 91 miles from McKean County, and OPM reported that "the Appalachian Mountains tend to isolate [McKean County] and can present significant obstacles for travel to either the Pittsburgh or Buffalo ... survey areas." *Id.* OPM also reported that less than 1 percent of the McKean County workforce was commuting to either Buffalo or Pittsburgh for work. *Id.* at 56. In the court's view, these facts support OPM's decision that distance, alone, was not a compelling reason to change McKean County's wage area in 1994.[9]

Several other facts help to put OPM's 1994 decision in context. OPM policy was to alter local wage area boundaries only when there were compelling reasons to do so. *See* Pls.' App. at 440 (noting that both OPM and the FPRAC would only recommend changing a nonsurvey area's local wage area if there was "something that really stuck out ... that needed to be corrected"). OPM also had a longstanding policy of keeping national forest counties in the same local wage area, as discussed *supra*, to avoid pay inequities with-

---

8. Indeed, in 1994 the labor representatives serving on the FPRAC and OPM were in agreement that changing the boundaries of wage areas was disfavored, unless a compelling reason to change those boundaries had arisen. *See* Def.'s Reply App. at 35–40.

9. OPM recommended that one Pennsylvania county, Fulton County, be changed from the Pittsburgh wage area in 1994. Pls.' App. at 35. An OPM representative stated that both distance and an additional factor such as commuting patterns supported that change, *id.* at 440, whereas McKean County remained in the Pittsburgh wage area because only distance favored its reclassifi-

cation to the Buffalo wage area. Indeed, OPM noted in its proposed rule that Fulton County was only 23 miles from a closer survey area and 144 miles from Pittsburgh, and that 55 percent of Fulton County residents commuted to that closer survey area and less than 1 percent of Fulton County residents commuted to Pittsburgh to work. *See* Prevailing Rate Systems; Redefinition of Certain Federal Wage System Wage Areas, 60 Fed.Reg. 65245, 65245 (proposed Dec. 19, 1995). The weight accorded to distance in these two 1994 OPM decisions is rational and in accordance with 5 C.F.R. § 532.211(d).

472

in the forest.[10] Furthermore, in 1994, neither the union representing prevailing rate federal employees in McKean County, nor the FPRAC, advocated that McKean County be changed to the Buffalo wage area.[11] When all of these facts are considered, and the distance factor is accorded considerable but not controlling weight, the court cannot find that OPM's 1994 decision was a clear error of judgment, implausible, or contrary to regulation.

### CONCLUSION

The court finds that OPM's 1994 decision to keep McKean County in the Pittsburgh wage area was neither arbitrary nor capricious, and was not an abuse of discretion. Thus, at all times relevant to this suit, OPM did not abuse its discretion in its local wage area classification of McKean County, Pennsylvania, and plaintiffs' pay claims must fail. Because there is no genuine issue of material fact and plaintiffs' pay claims fail as a matter of law, the court denies plaintiffs' motion for summary judgment and grants defendant's cross-motion for summary judgment.

Accordingly, it is hereby **ORDERED** that:

(1) Plaintiffs' Motion for Summary Judgment, filed January 21, 2011, is **DENIED;**

(2) Defendant's Cross–Motion for Summary Judgment, filed February 22, 2011, is **GRANTED;**

(3) The Clerk's Office is directed to **ENTER** final judgment for defendant and to **DISMISS** the complaint, with prejudice; and

(4) Each party shall bear its own costs.

---

**10.** Although plaintiffs argue that defendant's evidence of this policy is vague, weak, and that this particular OPM policy is irrelevant to this case, Pls.' Resp. to Def.'s Facts ¶ 12, they submitted no evidence to create a genuine issue of material fact as to the existence of this policy. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 (noting the burden on the party resisting summary judgment to produce significantly probative evidence). The record contains no "evidentiary conflict" regarding the OPM policy of keeping national forests in the same local wage area, where practicable. *Barmag,* 731 F.2d at 836.

**11.** The record before the court shows that the adjustment of local wage area boundaries is prompted, at least at times, by requests from unions representing federal prevailing rate employees. *See* Def.'s App. at 16–17, 26–27; Pls.' App. at 81, 89 (OPM response to successful labor proposal to change McKean County to the Buffalo wage area); *id.* at 124–25 (presentation of successful labor proposal to move Sebastian County, Arkansas to the Tulsa, Oklahoma wage area).